[Cite as *State v. Mendoza*, 2017-Ohio-8977.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 16AP-893 |
| | | (C.P.C. No. 16CR-1482) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Michael D. Mendoza, | : | |
| Defendant-Appellant. | : | |

---

### D E C I S I O N

#### Rendered on December 12, 2017

---

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee.  **Argued**: *Valerie Swanson*.

**On brief**: *Carpenter Lipps & Leland LLP*, *Kort Gatterdam*, *Erik P. Henry*, and *David F. Hanson*, for appellant.  **Argued**: *David F. Hanson*.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Michael D. Mendoza, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of felonious assault.

{¶ 2} On March 16, 2016, appellant was indicted on one count of felonious assault, in violation of R.C. 2903.11, and two counts of robbery, in violation of R.C. 2911.02.  The matter came for trial before a jury beginning November 8, 2016.

{¶ 3} Mark Walder, age 48, owns a carpet cleaning company, Hospitality Carpet Care, and the bulk of his business involves providing services to hotels, restaurants, and "hospitality-type" industries.  (Tr. Vol. I at 57.)  Walder's largest client, Indus Hotel

Group, owns several hotels in the Columbus area, including the Hampton Inn, located in downtown Columbus at 501 North High Street.

{¶ 4}   Walder currently has two employees, and employs other workers on an as-needed basis.  Walder first met appellant during summer 2015, after appellant's father, a friend of Walder, inquired as to whether Walder might have an employment opportunity for his son.   Walder subsequently contacted appellant "from time to time" about performing work for his carpet cleaning business.  (Tr. Vol. I at 64.)

{¶ 5}   On the morning of February 22, 2016, Walder woke up early and realized he might not have enough workers for a job site at the downtown Hampton Inn.  Walder decided to reach out to appellant via Facebook Messenger.  Walder and appellant "had a back and forth whether he would come to work that day" because of an issue involving money Walder owed appellant for 10 to 15 hours of work appellant had performed the previous week at a different hotel.   (Tr. Vol. I at 67.)  Walder had been in Florida that week, but had made arrangements for another employee, Anthony Miller, to pay appellant the money he was owed.  Miller, however, had not yet provided the money to appellant.

{¶ 6}   Walder informed appellant, during the Facebook Messenger interaction, that if he came to work that morning "he could make some money as well as get paid for 15 or so hours that was still owed to him."  (Tr. Vol. I at 70.)  According to Walder, appellant "didn't seem too interested in coming to work, but he * * * started to be somewhat argumentative about why he didn't get paid."  (Tr. Vol. I at 71.)  Walder and appellant "couldn't really come to a conclusion as to whether he was coming to work or not."  At one point during the Facebook Messenger interaction, appellant "threatened violence to * * * Miller for not paying him and threatened to * * * put his ass to sleep if he came to work." (Tr. Vol. I at 72.)

{¶ 7}   Walder, who was concerned about a confrontation at the job site, instructed appellant "not to come there with a bad attitude."   Walder told appellant he would "provide him his check or pay him later that day."  Walder viewed it as a "tossup" whether appellant would show up for work.  (Tr. Vol. I at 73.)

{¶ 8}   Walder and Miller arrived at the hotel job site that morning and began cleaning carpets.  Around noon, after they had been working approximately three hours, appellant "showed up on the fifth floor demanding his money."   Walder explained to

appellant he did not have his money, and he was unable to go to the bank at that time and leave Miller alone at the job site, "so he'd have to wait until after the job was over."  (Tr. Vol. I at 76.)

{¶ 9}   Appellant "then began to be very argumentative" toward Miller "because he thought * * * Miller was holding back the money that I had given him for whatever reason."  (Tr. Vol. I at 76.)  Appellant "started to become belligerent," and "[h]is voice became escalated."  (Tr. Vol. I at 76-77.)

{¶ 10}  At that time, Walder asked appellant to leave the site out of concern that he was becoming "loud" and "would disturb the guests at the hotel."  Appellant responded "he wanted his money." Walder told appellant he would "pay him that evening," and asked him to "please leave" because he did not "want to have to call security."  (Tr. Vol. I at 77.)

{¶ 11}  Walder and Miller "started to go back to work."  (Tr. Vol. I at 77.)  Miller left the immediate area to work in one of the guest rooms.  Walder testified he was near a wall on one side of a room and appellant was standing beside a wall on the other side of the room.  According to Walder, appellant was never closer than ten feet away, and they were never "in each other's face or anything like that."  (Tr. Vol. I at 79.)  Once appellant's voice "began to be raised and [he] started to be a little bit more irritated," Walder "moved further away and * * * threatened to [call] security and turned [his] back."  (Tr. Vol. I at 79-80.)

{¶ 12}  Walder then heard appellant state: "I have nothing to lose."  Walder "turned back around," at which time appellant struck him in the face, breaking his jaw.  Walder estimated that appellant ran ten feet across the room before striking him.  Walder "started gushing with blood." Miller "heard the impact" and looked into the room.  (Tr. Vol. I at 77.)  Walder testified that appellant then reached down and took his and Miller's jackets.

{¶ 13}  After the incident, Miller accompanied Walder to the work truck and drove Walder to Riverside Methodist Hospital.  Walder's jaw was broken in two places, and an artery was severed in the back of his neck.  Walder underwent four hours of surgery, and his jaw was wired shut for six weeks. While Walder was in the hospital, appellant phoned him "demanding payment for his hours."  (Tr. Vol. I at 95.)  At trial, Walder identified appellant as his assailant.

{¶ 14} Walder denied ever threatening appellant or lunging toward him during the incident. Walder stated that he "retreated and tried to continue to go back to work." (Tr. Vol. I at 82-83.)

{¶ 15} Miller, age 26, is a manager of a bar, and during winter months he has worked for Walder. In his employment with Walder, Miller worked on carpet cleaning jobs with appellant "two or three times." (Tr. Vol. I at 108.)

{¶ 16} A week or two prior to the incident, Miller and appellant worked together cleaning carpets at a hotel while Walder was out of town. After work, Miller gave appellant a ride home, and Miller then drove to Walder's residence to return a work truck. Walder had also instructed Miller to pay appellant, and Miller was going to pick up the money at Walder's residence "to give to [appellant] for his work." (Tr. Vol. I at 122.) Miller testified that he was unsuccessful in reaching appellant by phone and, therefore, was "unable to get in contact with him" about the money. (Tr. Vol. I at 123.)

{¶ 17} Miller gave the following testimony regarding the events on February 22, 2016. On that date, he and Walder were on the job site approximately four or five hours "cleaning all the hotel rooms on the fifth floor." (Tr. Vol. I at 125.) Miller was in a room cleaning carpets when he "heard loud voices in the hallway." He walked out to the hallway "to see what the confrontation was." The voices were getting louder, and Miller observed Walder "trying to calm the situation" and to "quiet [appellant] down." (Tr. Vol. I at 126.)

{¶ 18} Miller testified that appellant was "frustrated, I'm not sure if this was the money situation or what, but just when he saw me he kind of turned toward me and started hollering towards me." At the time, Walder was "trying to get us both away and keep the area * * * quiet." (Tr. Vol. I at 128.) Walder asked Miller to return to the room where he had been working.

{¶ 19} Miller "turned to head back into the room," and he "took maybe a couple steps and heard probably the loudest pop [he had] ever heard." Miller looked over toward Walder, who was "bleeding all over his hands and his jaw was sitting on his tongue inside of his mouth." (Tr. Vol. I at 126.) Walder was "holding his jaw and turns towards me and said, he just broke my jaw." (Tr. Vol. I at 131.)

{¶ 20} Miller observed appellant backing away. As Miller assisted Walder to the elevator, appellant was looking around; appellant then "bends down and grabs our jackets." Miller testified he asked appellant for his jacket: "I was like, come on, can we have our jackets back? And he looked at me and said come fight [me] for them." Miller told appellant he was "here to work, not to fight." (Tr. Vol. I at 132.) Miller and Walder entered the elevator and went downstairs to the work truck; Miller then drove Walder to the hospital.

{¶ 21} On February 23, 2016, Columbus Police Officer Joseph Abdalla was dispatched to the hospital to respond to a report of an assault. Officer Abdalla spoke with Walder, who had been hospitalized for approximately 24 hours. Walder had "medical hardware in his mouth," and he provided the officer with appellant's name. (Tr. Vol. I at 43.) Walder also informed the officer that a co-worker, Miller, had been present during the incident.

{¶ 22} Appellant, age 26, testified on his own behalf. Appellant acknowledged previously serving a four-year sentence for a felony burglary offense committed in 2009; he also acknowledged a 2014 felony conviction for receiving stolen property.

{¶ 23} Appellant began working for Walder after appellant's father introduced them. At the time of the incident, appellant had been cleaning carpets for Walder on a part-time basis. The week prior to the incident, while Walder was out of town, appellant had performed some work for which he had not yet received payment.

{¶ 24} On February 22, 2016, Walder contacted appellant via Facebook Messenger about a carpet cleaning job. Appellant testified that when Walder "first contacted me * * * I was kind of trying to find a few things out and he became real * * * belligerent and disrespectful towards me. And at that point I just * * * pretty much told him * * * I would just like to be paid and go our separate ways." (Tr. Vol. I at 170.)

{¶ 25} Appellant stated that his intention in going to the Hampton Inn that morning was "[s]imply to go get paid * * * and leave." (Tr. Vol. I at 171.) Appellant arrived at the hotel and observed Walder's work truck and hoses. He followed the hoses up to the fifth floor. When he arrived, appellant observed Walder in a room performing work; Miller was also cleaning rooms on the floor.

{¶ 26} Appellant told Walder he did not come there to work, and that he was only there to receive his paycheck. Appellant acknowledged raising his voice and getting into an argument with Walder. Appellant "was under the impression that [Walder] had no intentions of paying me." (Tr. Vol. I at 173-74.) At one point, appellant went over "to talk to Miller because there was an issue about me using the phone all day the previous Friday that me and him worked, and * * * we didn't come to any type of conclusion on that." (Tr. Vol. I at 174.)

{¶ 27} Appellant was "kind of upset" and "disappointed" with Walder. (Tr. Vol. I at 175.) Appellant also testified he was "kind of nervous, anxious I would say a little * * * confused" as to why Walder would call him to the site and not pay him. Appellant stated that Walder's "shoulder was facing me maybe roughly five feet away." According to appellant, Walder "turned and started walking, like, charging, not like - - kind of aggressively turned and charged towards me. I don't want [to] say like he lunged or tried to tackle me, but like in an aggressive manner and I swung and backed up and I just continued backing away from him." (Tr. Vol. I at 176.)

{¶ 28} When asked what was going through his mind as Walder first approached, appellant responded: "I did not know what he was going to do. I was nervous about the situation. I mean, I was kind of scared, I wouldn't say I don't know how to defend myself, but I was kind of scared, like, just walking towards me." (Tr. Vol. I at 179.) Appellant testified that he threw the punch because "I just * * * felt unsafe, to defend myself." (Tr. Vol. I at 180.)

{¶ 29} Around that time, Miller "came out of the room" he had been cleaning and appellant "continued backing away from them." Walder and Miller "proceeded onto the elevator," and appellant then "turned around and left as well." (Tr. Vol. I at 176.)

{¶ 30} On cross-examination, appellant acknowledged that, during his Facebook Messenger interaction with Walder, he made a reference to Miller in which he stated: "I made money last week on top of the money your bitch-ass employee has owed me since Kentucky. You're lucky I didn't knock him out on the job because I'm really that type of dude, Mark. I don't know why you want to see my true colors." (Tr. Vol. I at 194.) Appellant also acknowledged stating about Miller: "I can get my money from him or put

his ass to sleep." (Tr. Vol. I at 195.) Appellant denied being angry with Walder at the time of the incident.

{¶ 31} Over the objection of defense counsel, plaintiff-appellee, the State of Ohio, recalled Walder as a rebuttal witness. Following deliberations, the jury returned verdicts finding appellant guilty of felonious assault, but not guilty of the robbery counts. By judgment entry filed December 8, 2016, the trial court imposed a sentence of five years incarceration, to be served concurrently with appellant's sentence in Franklin C.P. No. 15CR-2777.

{¶ 32} On appeal, appellant sets forth the following six assignments of error for this court's review:

> FIRST ASSIGNMENT OF ERROR: THE STATE'S USE OF PEREMPTORY CHALLENGES TO EXCUSE JURORS BECAUSE OF THEIR RACE VIOLATED *BATSON V. KENTUCKY* AND DEPRIVED APPELLANT EQUAL PROTECTION OF THE LAW.
>
> SECOND ASSIGNMENT OF ERROR: APPELLANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS AND A FAIR AND IMPARTIAL JURY WHEN THE TRIAL COURT REFUSED TO EXCUSE FOR CAUSE A JUROR WHO COULD NOT BE FAIR AND IMPARTIAL.
>
> THIRD ASSIGNMENT OF ERROR: APPELLANT WAS DENIED HIS RIGHTS TO A FAIR TRIAL, TO COUNSEL, TO PRESENT A DEFENSE, AND TO DUE PROCESS CONTRARY TO THE OHIO AND UNITED STATES CONSTITUTIONS WHEN THE TRIAL COURT ORDERED APPELLANT TO WEAR RESTRAINTS WITHOUT ADEQUATE JUSTIFICATION.
>
> FOURTH ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED AND DENIED APPELLANT DUE PROCESS AND HIS RIGHT TO A FAIR TRIAL BY PERMITTING THE STATE TO CALL THE ALLEGED VICTIM AS A REBUTTAL WITNESS DESPITE ALREADY TESTIFYING DURING THE STATE'S CASE-IN-CHIEF.
>
> FIFTH ASSIGNMENT OF ERROR: APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

TO THE UNITED STATES CONSTITUTION, AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

SIXTH ASSIGNMENT OF ERROR: THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

{¶ 33} Under the first assignment of error, appellant contends the trial court erred in rejecting defense counsel's objection to the state's use of peremptory challenges to excuse two African-American jurors, asserting that the state's use of the challenges was in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Specifically, appellant points to the fact that, at the conclusion of voir dire, the state used its first peremptory challenge on Juror No. 2, S.M., and its fourth peremptory challenge on Juror No. 1, T.C. Appellant maintains the evidence did not support the prosecutor's purported race-neutral explanations.

{¶ 34} In *State v. Murphy,* 91 Ohio St.3d 516, 528 (2001), the Supreme Court of Ohio discussed the test under *Batson* for determining whether a prosecutor's use of peremptory challenges is racially motivated, holding in part:

> The Equal Protection Clause of the Fourteenth Amendment strictly prohibits a state actor from engaging in racial discrimination in exercising peremptory challenges. Such discrimination is grounds to reverse a conviction returned by a jury tainted with such discrimination.
>
> A court adjudicates a *Batson* claim in three steps. In step one, the opponent of the peremptory challenge at issue must make a prima facie case that the proponent was engaging in racial discrimination. In step two, the proponent must come forward with a race-neutral explanation for the strike. In step three, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved racial discrimination.

(Citations omitted.)

{¶ 35} As noted, appellant challenges the state's peremptory challenges as to two prospective jurors, S.M. and T.C. With respect to S.M., the record indicates that, after the

prosecutor questioned prospective jurors during voir dire, the prosecutor asked all of the prospective jurors whether there was "anything that we talked about or caused you concern that you think I might need to know before we impanel you as jurors." S.M. raised her hand and indicated she had such a concern, but further stated she did not "want to necessarily discuss it in front of everybody." (Voir Dire Tr. at 122.)

{¶ 36} Following a recess by the trial court, S.M. was questioned outside the presence of the other prospective jurors. S.M. stated she had previously been "involved in a domestic violence issue," and she was "pretty sure" that the prosecutor "was actually on the case." (Voir Dire Tr. at 133.) S.M. stated to the prosecutor: "[Y]ou look familiar, but I can't remember." S.M. explained that she was the defendant in the domestic relations case, and that the case "started as a domestic violence and it was reduced to a misdemeanor." (Voir Dire Tr. at 134.)

{¶ 37} The prosecutor, after obtaining information on the case outside the presence of S.M., indicated to the trial court that the case "was a misdemeanor case filed in Franklin County Municipal Court." (Voir Dire Tr. at 138.) The prosecutor represented that the case "was not filed as a felony or even considered for a felony enhancement so I would have never been the prosecutor on it." (Voir Dire Tr. at 138-39.) The prosecutor further stated: "She's obviously confusing me with a city prosecutor." S.M. was then called back, and the prosecutor informed S.M.: "I've looked up the case, it appears I was not the prosecutor on that" case. S.M. responded: "Okay." (Voir Dire Tr. at 139.) The prosecutor then asked S.M. whether there was anything about the way the prosecutor handled the domestic relations case that would "leave a distaste in your mouth?" S.M. responded: "Absolutely not, no." (Voir Dire Tr. at 141.)

{¶ 38} The prosecutor subsequently exercised peremptory challenges as to four prospective jurors, including S.M and T.C. At that time, defense counsel raised a "Batson argument" before the trial court, noting that "[T.C.] and also [S.M.] were African American." (Voir Dire Tr. at 152-53.) The trial court then requested a response from the prosecutor, who stated the following grounds for requesting the peremptory challenges:

> [THE PROSECUTOR]: Well, Your Honor, the defense has to put on prima [facie] evidence before I have to put on reasons in response they're not [pretextual]. I don't think he's shown a prima [facie] case. I did excuse two female white jurors as well.

But the reason why I thanked and excused [S.M.] was because she was the defendant in a domestic violence case. Whether she says she could be fair and impartial to the prosecution, she thought I was the prosecutor and I don't know if she's going to have any underlying bias against prosecutors, certainly she thought I was the one who prosecuted that case. So that's the sole reason for striking her.

The sole reason for striking [T.C.] is because he's young certainly and impressionable at this time regardless of his race. I'm afraid that with his youth he will not have much to add to the deliberations. In fact, I was watching him throughout my voir dire and he seems to just follow along with the crowd in dealing with the one-witness rule in particular and the knowingly and purposely. I didn't get a good satisfaction that he was, in fact, grasping these concepts which I deem to be very important to my case. Thank you, Your Honor.

(Voir Dire Tr. at 153-54.)

{¶ 39} Following the prosecutor's explanation, the trial court inquired whether defense counsel had any further argument. Defense counsel stated: "No response, Your Honor." (Voir Dire Tr. at 154.) The trial court overruled the *Batson* challenge, stating on the record: "With respect to the Batson challenge regarding [T.C.] the defense did not set forth any evidence or any facts that would establish prima facie case of discrimination with respect to peremptory challenges and the state offered a [neutral] explanation for its exercise of its peremptory challenge to both [S.M.] as well as to [T.C.]." (Voir Dire Tr. at 154-55.)

{¶ 40} Thus, with respect to the state's peremptory challenge involving S.M., the record indicates the prosecutor expressed concern that the juror mistakenly believed the prosecutor had prosecuted a previous domestic relations case in which S.M. was the defendant; the prosecutor was also concerned that the prospective juror may have an "underlying bias against prosecutors" in light of that prior proceeding. As noted, defense counsel did not challenge the explanation. (Voir Dire Tr. at 153.)

{¶ 41} On review, the record supports the prosecutor's explanation that S.M. was apparently mistaken about the prosecutor's purported involvement in a domestic relations case in which S.M. was the defendant. Although the prosecutor informed S.M.

that she was mistaken, the prosecutor could have reasonably been concerned about the potential for bias against the prosecution in light of this prospective juror's past personal experience as a defendant, and we find no error with the trial court's determination that the prosecutor offered a race-neutral justification for the peremptory challenge. *See State v. McElrath,* 114 Ohio App.3d 516, 522 (9th Dist.1996) (prosecutor's concern that prospective juror "may have had a negative experience with the prosecutor's office, and might therefore have a bias against the prosecution," constituted a "race neutral" explanation). Accordingly, the trial court did not err in denying appellant's *Batson* challenge as to this prospective juror.

{¶ 42} Appellant also challenges the prosecutor's explanation for striking prospective juror T.C. on the basis of the juror's age (or youth). Ohio courts have held, however, that age is a race-neutral factor in the context of a *Batson* challenge. *See State v. Robinson*, 5th Dist. No. 09 CAA 03 0029, 2009-Ohio-5917, ¶ 33 ("the State offered a race-neutral explanation for its use of a peremptory challenge for this juror, stating that it had concerns about the juror's age, the juror being only twenty (20) years old, and how his age may affect his thinking in this particular case"); *State v. Curtis*, 3d Dist. No. 9-02-11, 2002-Ohio-5409, ¶ 49 (prosecutor's proffered explanation that he struck juror "because of his young age, he was single, and his minimal ties to the community" was race neutral and satisfied the prosecution's burden of articulating a non-discriminatory reason for peremptory strike).

{¶ 43} We note that federal courts have similarly recognized age as a "legitimate" reason for peremptorily striking potential jurors. *United States v. Clemons,* 941 F.2d 321, 325 (5th Cir.1991). *See also Howard v. Moore*, 131 F.3d 399, 408 (4th Cir.1997) ("age is an acceptable race-neutral factor" for peremptory challenge); *United States v. Williams*, 214 Fed.Appx. 935, 936 (11th Cir.2007) (trial court did not err in finding that prosecutor's reason for striking prospective juror because of "her youth and lack of worldly experience" constituted a legitimate race-neutral explanation); *United States v. Alston,* 188 Fed.Appx. 186, 188 (4th Cir.2006) ("age is an acceptable race-neutral explanation").

{¶ 44} Here, the prosecutor offered a race-neutral explanation for the peremptory challenge, citing the youth of the prospective juror, and there is nothing to suggest that the prosecutor's explanation was pretextual. The trial court determined there was no

indication of purposeful discrimination, and we find no basis in the record to disturb that determination. We therefore find no error with the trial court's decision to overrule the *Batson* challenge as to this prospective juror.

{¶ 45} Appellant's first assignment of error is not well-taken and is overruled.

{¶ 46} Under the second assignment of error, appellant contends the trial court erred in refusing to excuse a prospective juror for cause who could not be fair and impartial. Specifically, appellant argues the trial court should have excused prospective Juror No. 12, C.M., who indicated she had previously been employed in law enforcement. Appellant argues that answers provided by C.M. during voir dire indicated she could not render a verdict based on the evidence presented, thereby requiring defense counsel to exercise a peremptory challenge to excuse her.

{¶ 47} By way of background, C.M. stated during voir dire that she was "a retired executive secretary for the State Highway Patrol and I've worked investigations so I have the law enforcement side." When asked by the prosecutor whether she "[w]ould * * * be able to set that prior experience aside in this particular case," C.M. initially responded: "I don't think so." (Voir Dire Tr. at 23.) When asked again by the prosecutor whether she would have difficulty setting aside her experience and background, C.M. stated: "I think what I would be looking at, taking that experience and looking at both sides, you know, your side, his side." (Voir Dire Tr. at 24.) Later during voir dire, the prosecutor revisited the issue of this prospective juror's background with the State Highway Patrol, and inquired of C.M. whether she could "decide this case fairly and impartially?" C.M. responded: "Yes." (Voir Dire Tr. at 79.)

{¶ 48} At the close of voir dire, defense counsel requested the trial court excuse C.M. for cause.[1] In response, the prosecutor stated: "I followed up with her at the end of the questioning and said, would your relationship with the Ohio State Patrol officers impact your ability to decide this case fairly and impartially and she said no she didn't think that it would." (Voir Dire Tr. at 148-49.) Defense counsel indicated he did not "recall hearing that she could set those aside." (Voir Dire Tr. at 149.) The prosecutor then reiterated that the prospective juror "did say, yes, she would be able to decide the facts of

---

[1] The trial court initially indicated it would grant the request to excuse Juror No. 12, but after the prosecutor noted that Juror No. 12 was "the highway patrol one," the trial court acknowledged "confusing" this juror with another prospective juror. (Voir Dire Tr. at 148-49.)

the case and apply the fact[s] and apply the law."  (Voir Dire Tr. at 150.)  The trial court ruled that it would not dismiss C.M. for cause, and defense counsel subsequently utilized a peremptory challenge to excuse her.

{¶ 49}  R.C. 2945.25 states in part as follows:

> A person called as a juror in a criminal case may be challenged for the following causes:
>
> * * *
>
> (B) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.

{¶ 50}  Under Ohio law, "[a] prospective juror may be challenged for cause if there is a demonstration of bias toward the defendant."  *State v. Mulvey,* 7th Dist. No. 08 BE 31, 2009-Ohio-6756, ¶ 21, citing R.C. 2945.25(B); Crim.R. 24(C)(9).  Further, "[a] trial court has the broad discretion to determine whether a juror has the ability to be impartial," and the court "may rely on the juror's testimony in order to determine that juror's impartiality."  *Id.*   In instances in which a prospective juror is challenged for bias, "a reviewing court must pay deference to the trial court, who was able to see and hear the prospective juror and the exchanges during voir dire."  *Id.*  Finally, "[a] trial court's ruling on a challenge for cause will not be disturbed by a reviewing court 'unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion.' "  *Id.* at ¶ 22, quoting *State v. Williams*, 79 Ohio St.3d 1, 8 (1997).

{¶ 51}  On review, we find no abuse of discretion by the trial court in failing to excuse C.M. for cause.  As observed by appellant, C.M.'s initial responses to inquiries by the prosecutor raised questions about her ability to set aside her background and experience in law enforcement.  However, when later questioned about whether she could be fair and impartial, C.M. responded affirmatively.  Here, the trial court had the opportunity to observe and determine whether the prospective juror was sufficiently rehabilitated by the follow-up questioning by the prosecutor.  *See State v. Dye,* 8th Dist.

No. 103907, 2016-Ohio-8044, ¶ 28 ("although the juror's initial statements appeared to cast some doubt on her impartiality, the juror's qualification to serve as [a] fair and impartial juror was sufficiently rehabilitated upon the trial court's further examination"). Further, the trial court was entitled to accept the assurances of the prospective juror that she would be fair and impartial. *State v. Jones,* 91 Ohio St.3d 335, 338 (2001).

{¶ 52} Appellant's second assignment of error is overruled.

{¶ 53} Under the third assignment of error, appellant contends he was denied the right to a fair trial where the trial court ordered him to wear leg restraints during trial. Appellant argues there was no evidence he needed to be restrained, and cites the fact there was no hearing on the record justifying the need for restraints. According to appellant, the leg irons inhibited his ability to concentrate on the evidence.

{¶ 54} In *State v. Boone,* 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 16, this court noted that "[t]he usual practice * * * is for a defendant to appear in court free of shackles." However, "it is widely accepted that a prisoner may be shackled in some circumstances." *Id.* Further, "[t]he decision to impose such restraints is left to the sound discretion of the trial court, [which] must exercise its own discretion and not leave the issue up to security personnel." *Id.*

{¶ 55} A review of the record indicates that, at the start of trial, defense counsel made the following inquiry to the court: "Your Honor, before we bring the jury in, I understand about the shackles on his ankles, but if we could remove the handcuffs from him, if that would be permissible?" The trial court responded: "Yes. I will ask that those be removed." (Tr. Vol. I at 11.)

{¶ 56} Later, prior to appellant taking the witness stand (and outside the presence of jurors), defense counsel inquired as to how the trial court "wanted to proceed with his taking the witness stand, if [the prosecutor is] going to rest, he has leg irons on. I know we have to have a deputy go over there with him." The trial court responded: "What I would do is move him over there before you rest, like probably now, and then bring [the jury] in and let you rest and do the stipulation and will just let you rest and then we'll go from there." (Tr. Vol. I at 161.) A short time later, the trial court stated: "All right. So if you want to move Mr. Mendoza, come on over and just be seated, sir." (Tr. Vol. I at 164.) After appellant concluded his testimony, the trial court dismissed the jury for a recess and

told appellant: "Mr. Mendoza, you can go ahead and go back to the table."  (Tr. Vol. I at 222.)

{¶ 57} As noted, appellant contends the trial court rendered its decision to impose shackles without first conducting a hearing.  This court, however, has previously observed that while "the Supreme Court of Ohio encourages trial courts to hold a hearing on the matter * * * the court has never required a hearing." *Boone* at ¶ 17.  Rather, " '[w]here the facts and circumstances surrounding a defendant illustrate a compelling need to impose exceptional security procedures, the trial court's exercise of discretion in this regard should not be disturbed unless its actions are not supported by the evidence before it.' " *Id.*, quoting *State v. Franklin,* 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 82.  Accordingly, "there is no per se error because the trial court did not hold a hearing to address its security concerns." *Id.*

{¶ 58} In the present case, even assuming the trial court abused its discretion in ordering shackles, any such error is harmless as appellant cannot demonstrate prejudice where the record fails to suggest the jury observed the shackles or that the wearing of shackles affected the outcome of the trial.  *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914.  *See also State v. Chester*, 10th Dist. No. 08AP-1, 2008-Ohio-6679, ¶ 12 (any error by trial court in ordering shackles harmless where "no evidence that the jury ever saw appellant wearing the shackles").  As reflected in the transcript portions cited above, the record indicates the trial court took precautions to ensure appellant was taken to the witness stand outside the presence of the jury, and there is simply no evidence that any juror observed the leg shackles during the trial.  Nor does the record on appeal suggest the leg shackles inhibited appellant's ability to communicate with counsel or to testify. *Chester* at ¶ 14 (noting the record was "devoid of any suggestion that the shackles prevented appellant from conferring with his counsel with respect to his own defense").

{¶ 59} Accordingly, appellant's third assignment of error is not well-taken and is overruled.

{¶ 60} Under the fourth assignment of error, appellant contends the trial court erred in allowing the state to call the alleged victim as a rebuttal witness despite already having testified during the state's case-in-chief.  According to appellant, Walder's rebuttal testimony merely repeated his previous testimony from the state's case-in-chief and did

not offer anything new of substance, making it improper.  In response, the state argues appellant acknowledges new information was elicited on rebuttal, and that clarifying details were elicited.

{¶ 61} The record indicates that, following appellant's testimony, the prosecutor sought to call Walder as a rebuttal witness.  Defense counsel objected on the basis that the state was "recalling a witness who has previously testified."  The prosecutor responded: "Your Honor.  This is rebuttal and there is some issue that came out in [appellant's] testimony that are directly rebutted by * * * Walder and he was not in the courtroom when [appellant] testified."  The trial court permitted the witness to take the stand, with the admonition that "[t]he testimony will be limited, obviously, to rebuttal only."  (Tr. Vol. I at 238.)

{¶ 62} During rebuttal, questions propounded by the prosecutor to Walder included whether he had received any advance notice that appellant would be at the hotel, apart from "the kind of conversation that we've already been through." (Tr. Vol. I at 240.) The prosecutor also asked Walder if he ever "charge[d] towards [appellant] in a threatening manner."  (Tr. Vol. I at 242.)  In addition, the prosecutor questioned Walder about the phone call he received from appellant while in the hospital.  When asked about the phone conversation, Walder testified: "I could not really speak, my mother took the phone and explained to him the damage that he inflicted and he still demanded money and she hung up."  (Tr. Vol. I at 247.)

{¶ 63} The Supreme Court has held that "[r]ebutting evidence is that given to explain, refute, or disprove new facts introduced into evidence by the adverse party; it becomes relevant only to challenge the evidence offered by the opponent, and its scope is limited by such evidence."  *State v. McNeill,* 83 Ohio St.3d 438, 446 (1998).  Further, "[i]t is within the trial court's discretion to determine what evidence is admissible as proper rebuttal."  *Id.*

{¶ 64} As noted, appellant contends Walder's rebuttal testimony simply repeated his previous testimony, including prior testimony by Walder that he was uncertain whether appellant would show up at the hotel, and the fact that Walder informed appellant he did not have cash to pay him at the time.  Appellant contends the only new

information involved Walder's testimony that his mother spoke to appellant on the phone while Walder was in the hospital.

{¶ 65} In *State v. Sandlin,* 6th Dist. No. WD-83-96 (June 22, 1984), the appellant made a similar contention that the trial court erred in allowing the state to "repeat its case in chief during rebuttal" over the objection of defense counsel. In addressing this contention, the court in *Sandlin* held in part:

> Appellant correctly cites the case of Morris v. Faurot (1871), 21 Ohio St. 155, for the proposition that the practice of recalling a witness to repeat previously given testimony is not proper rebuttal. That opinion further determines, however, that when, from the nature of the case, it is next to impossible to get to the new facts without some repetition of a witness's former testimony:
>
> "* * * [S]ome latitude must be allowed for the exercise of discretion. Indeed, the exigencies of each particular case must go far in controlling the discretion of the court * * *." *Id.* at 161.

{¶ 66} Under the facts in *Sandlin,* the reviewing court found it "evident" that the victim was recalled in order to rebut appellant's claim that appellant had acted in self-defense in stabbing the victim. *Id.* The court in *Sandlin* determined that "[r]epetition of some of the victim's testimony given in the state's case in chief was, therefore, necessary to lay the foundation upon which rebuttal would be based." *Id.*

{¶ 67} We note that other jurisdictions have similarly recognized the reality, as observed by the court in *Sandlin,* that it is "next to impossible" in certain circumstances to get to new facts "without some repetition of a witness's former testimony." *Id.,* citing *Morris v. Faurot,* 21 Ohio St. 155 (1871). *See, e.g., State v. Simmons*, Wash.App. No. 18020-4-III (Oct. 28, 1999) ("true rebuttal evidence will, in some degree, overlap or coalesce with the evidence in chief"); *People v. Figgures*, 451 Mich. 390, 399 (1996) ("As long as evidence is responsive to material presented by the defense, it is properly classified as rebuttal, even if it overlaps evidence admitted in the prosecutor's case in chief."); *State v. Simonson*, 100 N.M. 297, 302 (1983) (noting difficulty in "[a]scertaining whether the rebuttal evidence is in response to new matters established by the defense," and that "[f]requently true rebuttal evidence, in some degree, will overlap and coincide with the evidence in the State's case-in-chief").

{¶ 68} In the present case, while Walder's testimony included some matters covered during the state's case-in-chief, there was also new information presented, as well as clarifying information that was arguably proper rebuttal evidence following appellant's testimony claiming self-defense. More specifically, in response to the prosecutor's inquiry about the phone call at the hospital, Walder revealed for the first time that his mother took the call. Further, the prosecutor questioned Walder about appellant's testimony that Walder turned toward appellant in a threatening manner. Walder also was questioned about appellant's claim that Walder charged at him, and Walder responded: "I never moved from the position I was in from beginning to end." (Tr. Vol. I at 242.) An additional inquiry by the prosecutor went to the issue of whether Walder did anything to make appellant "feel uncomfortable or unsafe." (Tr. Vol. I at 244.) Appellant had previously testified that he was "nervous" and "kind of scared" by Walder's conduct. (Tr. Vol. I at 179.) On review, despite the fact there was some repetition in Walder's testimony, we do not find the trial court's admission of Walder's rebuttal testimony constituted an abuse of discretion.

{¶ 69} Accordingly, appellant's fourth assignment of error is overruled.

{¶ 70} Under the fifth assignment of error, appellant asserts he was deprived of effective assistance of counsel. Specifically, appellant contends his trial counsel was ineffective in failing to: (1) offer any argument in support of the *Batson* challenge, (2) object to, or request a hearing on, the use of leg irons, (3) object to or move to strike the state's rebuttal evidence, (4) object to or move to strike testimony regarding appellant not filing a police report, and (5) request an instruction for aggravated assault as an inferior degree offense of felonious assault. Finally, appellant argues that the cumulative effect of counsel's errors resulted in the denial of a fair trial.

{¶ 71} The Supreme Court has adopted the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for resolving claims of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). Under this test, "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *Id.* at paragraph two of the syllabus. In order to demonstrate prejudice, "the defendant must prove that there exists a reasonable

probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 72} Three of appellant's claims of ineffective assistance of counsel involve issues raised in earlier assignments of error, i.e., defense counsel's *Batson* challenge, the failure of the trial court to hold a hearing on the use of leg irons, and the trial court's decision to permit rebuttal testimony. As to the *Batson* challenge, appellant argues that trial counsel was ineffective in failing to respond to the explanations provided by the prosecutor for the peremptory challenges. We have previously determined, however, that the trial court did not err in overruling defense counsel's *Batson* challenge and, based on the record presented, appellant cannot show prejudice as a result of counsel's purported failure to more vigorously argue the *Batson* challenge.

{¶ 73} We have also determined, in addressing the third assignment of error, that appellant was unable to show prejudice as a result of the trial court's ruling with respect to the use of leg irons where the record failed to show the jury observed the shackles or that the court's ruling otherwise affected the outcome of the proceedings. Accordingly, appellant cannot demonstrate prejudice based on a claim of ineffective assistance of counsel with respect to counsel's failure to request a hearing on that issue. *See State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 340 (claim that counsel was ineffective by failing to request hearing on necessity of wearing shackles lacked merit where nothing in the record indicated that any restraint used was visible to jury); *State v. Ayers,* 12th Dist. No. CA2010-12-119, 2011-Ohio-4719, ¶ 61 (rejecting claim of ineffective assistance of counsel resulting from trial counsel's failure to object to shackles as appellant was unable to establish prejudice where jury was unable to see him in shackles).

{¶ 74} We have also determined, in addressing the fourth assignment of error, that the trial court did not err in permitting the rebuttal testimony of Walder. Further, as noted under the facts, defense counsel did raise an objection to Walder being called as a rebuttal witness. Accordingly, appellant cannot demonstrate either deficient performance or prejudice.

{¶ 75} Appellant also contends his trial counsel was ineffective in failing to object to the prosecutor's inquiry of Walder as to whether appellant ever filed a police report regarding the incident. Appellant argues that the issue of whether or not he complained

about Walder's conduct was irrelevant as to whether he knowingly assaulted Walder. According to appellant, the probative value of this evidence was outweighed by the danger of unfair prejudice.

{¶ 76} In response, the state argues appellant cites no authority for the proposition that the testimony at issue was inadmissible. The state further argues that such testimony was relevant, i.e., the fact appellant never filed a police report tended to discredit his claim he was acting in self-defense. In support, the state cites *Baron v. Andolsek,* 11th Dist. No. 2003-L-005, 2004-Ohio-1159, ¶ 30 (deeming as relevant fact that parties "never memorialized their statement in writing nor filed a police report regarding the purported assault of which they were victims").

{¶ 77} On review, we agree with the state that appellant has failed to demonstrate the testimony was inadmissible as not relevant. *See, e.g., State v. Lakes,* 2d Dist. No. 21490, 2007-Ohio-325, ¶ 19 (finding relevant the fact that the defendant contended he killed victim in self-defense, yet ran from the scene of the shooting and "never reported the alleged robbery to the police"); *State v. Sullivan,* 8th Dist. No. 66831 (Feb. 2, 1995) (noting that, while appellant claimed self-defense, he "never contacted the police to report this incident"). Here, appellant cannot show that an objection to the testimony would have been sustained. Moreover, the record in this case does not establish a reasonable probability that, had an objection been made and sustained, the result of the proceeding would have been different.

{¶ 78} Appellant also claims his trial counsel was ineffective in failing to request an instruction for aggravated assault as an inferior degree offense of felonious assault. Appellant contends there was evidence of serious provocation on the part of Walder sufficient to allow the jury to reject felonious assault and to find him guilty of aggravated assault.

{¶ 79} In response, the state argues that such an instruction was not warranted as appellant never admitted to being under a sudden passion or fit of rage (as required for aggravated assault); further, the state maintains, the request for an instruction on aggravated assault would have contradicted appellant's claim that he was just trying to defend himself, i.e., acting out of self-defense.

{¶ 80} Under Ohio law, "a criminal defendant is entitled to an inferior-degree-offense instruction 'when the evidence presented at trial would reasonably support both an acquittal on the charged [offense] and a conviction for [the inferior-degree offense].' " *State v. Moore,* 4th Dist. No. 15CA3717, 2016-Ohio-8274, ¶ 13, quoting *State v. Shane*, 63 Ohio St.3d 630, 632 (1992).

{¶ 81} As noted, appellant was convicted of felonious assault, and Ohio courts have recognized that the crime of aggravated assault "is an inferior degree of felonious assault." *Id.* at ¶ 16, citing *State v. Deem*, 40 Ohio St.3d 205, 210-11 (1988). Specifically, "[t]he two offenses are identical, except aggravated assault contains serious provocation as a mitigating factor." *Id.* Accordingly, "in a trial for felonious assault, a trial court must give the jury an aggravated assault instruction if the defendant presents sufficient evidence of serious provocation such that a jury could both reasonably acquit the defendant of felonious assault and convict the defendant of aggravated assault." *Id.,* citing *State v. Mack*, 82 Ohio St.3d 198, 200 (1998).

{¶ 82} Serious provocation under Ohio's aggravated assault statute (R.C. 2903.12) "means provocation 'reasonably sufficient to bring on extreme stress and * * * reasonably sufficient to incite or to arouse the defendant into using deadly force.' " *State v. Saur,* 10th Dist. No. 10AP-1195, 2013-Ohio-1674, ¶ 31, quoting *Deem* at paragraph five of the syllabus. Further, "[t]he provocation must be 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' " *Id.,* quoting *Shane* at 635. In order to determine whether a defendant has presented "sufficient evidence to warrant an instruction on the inferior offense of aggravated assault, 'an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage.' " *Id.,* quoting *Mack* at 201. If the objective standard is met, "the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case ' "actually was under the influence of sudden passion or in a sudden fit of rage." ' " *Id.*, quoting *Mack* at 201, quoting *Shane* at 634-35.

{¶ 83} In the present case, we agree with the state's contention that the facts of this case did not warrant an instruction on the inferior offense, as the evidence fails to indicate appellant was under a sudden passion or fit of rage. As noted under the facts, appellant testified as to his state of mind during the events at issue. Specifically, appellant stated he

was "nervous about the situation," and "kind of scared." (Tr. Vol. I at 179.) Appellant, who denied being angry with Walder at the time of the incident, further stated he threw the punch because he just "felt unsafe, to defend myself." (Tr. Vol. I at 180.) Here, based on the record presented, appellant cannot show that a request for an instruction on the inferior degree offense would have been successful. *See State v. Ratcliff,* 10th Dist. No. 01AP-1349, 2002-Ohio-3727, ¶ 56 (evidence insufficient for the trier of fact to find that appellant acted under the influence of sudden passion or fit of rage where appellant testified that he was "scared" and that he struck at the victim with a knife out of fear for his safety); *State v. Poe,* 4th Dist. No. 00 CA 09 (Oct. 6, 2000) ("Neither appellant's evidence that he was afraid because he observed the victim with a hammer in his hand nor his evidence that the victim stated 'come on' sufficiently demonstrates serious provocation.").

{¶ 84} Furthermore, courts have held that "the failure to request an instruction on an offense of an inferior degree can be a matter of trial strategy." *State v. Levonyak,* 7th Dist. No. 05 MA 227, 2007-Ohio-5044, ¶ 19, citing *State v. Walker*, 4th Dist. No. 99CA2494 (June 26, 2000). Specifically, "[w]hen a defendant puts on a defense of self-defense, an instruction on the inferior degree offense could have been perceived by the jury as contradictory to the self-defense theory." *Id.* In this respect, courts have observed that "[i]t could confuse the jury to argue that defendant acted in fear for his life but also was provoked and acted in a fit of rage." *Id.* Accordingly, "it is a trial strategy for counsel to choose to go solely with the self-defense theory and not request an inferior degree offense," and "[t]rial strategies, even debatable ones, do not constitute ineffective assistance of counsel." *Id.*

{¶ 85} Based on the record before this court, appellant has failed to demonstrate deficient performance as a result of trial counsel's decision not to request an instruction on the inferior degree offense. *See State v. Sanders,* 9th Dist. No. 19783 (May 17, 2000) ("Since Defendant repeatedly stated that she was not mad, angry, or upset with the victim, but rather that she feared for her own safety, it was reasonable under the facts presented at trial for Defendant's counsel to pursue a self-defense trial strategy to seek an acquittal and not request an instruction on an inferior degree offense.").

{¶ 86} Finally, appellant contends the cumulative effect of defense counsel's errors resulted in the denial of a fair trial. In order to show cumulative error, however, there must be a showing of multiple errors to cumulate, and "[w]here no individual, prejudicial error has been shown, there can be no cumulative error." *State v. Jones,* 2d Dist. No. 20349, 2005-Ohio-1208, ¶ 66.

{¶ 87} Appellant's fifth assignment of error is not well-taken and is overruled.

{¶ 88} Under the sixth assignment of error, appellant asserts his conviction for felonious assault was against the manifest weight of the evidence. Appellant maintains the trier of fact should have found credible his testimony that Walder was the aggressor.

{¶ 89} In considering a claim that a conviction is against the manifest weight of the evidence, a reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175 (1983). Further, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 90} R.C. 2903.11 sets forth the offense of felonious assault, and R.C. 2903.11(A)(1) provides in part that "[n]o person shall knowingly * * * [c]ause serious physical harm to another." Under Ohio law, self-defense is an affirmative defense, which a defendant is required to prove by a preponderance of the evidence. *State v. Smith,* 10th Dist. No. 04AP-189, 2004-Ohio-6608, ¶ 16. In order to establish self-defense involving non-deadly force, a defendant must prove: "(1) he was not at fault in creating the situation that gave rise to the affray, (2) he had both reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent danger of bodily harm, and (3) the only means of protection from that danger was the use of force not likely to cause death or great bodily harm." *State v. DiFrancesca,* 10th Dist. No. 10AP-340, 2011-Ohio-3087, ¶ 33, citing *State v. McGowan,* 10th Dist. No. 08AP-55, 2008-Ohio-5894, ¶ 26.

{¶ 91} On review of the record, we are unable to conclude the jury clearly lost its way and created a manifest miscarriage of justice in rejecting appellant's self-defense theory and finding him guilty of felonious assault. As noted, appellant relies on his own

testimony that Walder was the aggressor, and that Walder was approaching him at the time he threw the punch that broke Walder's jaw in two places. The jury, however, was not required to believe appellant's version of the events, especially in light of the conflicting testimony. *See*, *e.g.*, *State v. Andrews,* 9th Dist. No. 25114, 2010-Ohio-6126, ¶ 23 (faced with conflicting evidence, jury was not required to believe appellant's version of events that he acted in self-defense when he inflicted injuries to victim); *State v. Socha,* 8th Dist. No. 76913 (May 10, 2001) ("Although defendant's testimony supported a claim of self-defense, the jury was not required to accept as true his version.").

{¶ 92} Here, the jury heard Walder's testimony that appellant came to the job site demanding payment for previous work he had performed. Walder testified he explained to appellant he did not have the money, and that appellant would have to wait until the end of the work day to be paid. Appellant became belligerent, and Walder asked him to leave to avoid disturbing guests at the hotel. According to Walder, his back was turned to appellant when he heard appellant state that he had "nothing to lose." When Walder turned back around, appellant struck Walder in the jaw, causing serious physical harm.

{¶ 93} At trial, Miller provided corroborating testimony as to Walder's account. Miller testified that appellant showed up at the job site and appeared "frustrated." At one point, appellant "started hollering" at Miller. Miller testified that Walder was attempting to keep the area quiet and calm down the situation. As Miller began to return to work, he heard a loud "pop," and then observed Walder bleeding. The jury also heard testimony that appellant had threatened violence against Miller via Facebook Messenger earlier that day because he had not yet been paid for prior work.

{¶ 94} On review, the jury verdict finding appellant guilty of felonious assault was not against the manifest weight of the evidence. Accordingly, appellant's sixth assignment of error is overruled.

{¶ 95} Based on the foregoing, appellant's six assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

SADLER and LUPER SCHUSTER, JJ., concur.

_____