[Cite as *State v. Reynolds*, 2019-Ohio-2343.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 18AP-560 |
| v. | : | (C.P.C. No. 17CR-5463) |
| Lamar D. Reynolds, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 13, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

APPEAL from the Franklin County Court of Common Pleas

KLATT, P.J.

{¶ 1} Defendant-appellant, Lamar D. Reynolds, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial. For the following reasons, we affirm that judgment.

{¶ 2} On October 6, 2017, appellant was indicted on one count of murder in violation of R.C. 2903.02(A) (purposely causing the death of another), one count of murder in violation of R.C 2903.02(B) (felony murder), and one count of having weapons while under disability in violation of R.C. 2923.13. Both murder counts contained three-year

firearm specifications pursuant to R.C. 2941.145(A). The indictment arose out of the shooting death of Damon Jenkins on September 30, 2017.

{¶ 3} On defense counsel's motion, the trial court ordered a competency evaluation for appellant. Following that evaluation, the trial court determined that appellant was competent to stand trial. The matter thereafter was tried to a jury in June 2018, at which the following evidence was adduced.

{¶ 4} In May 2009, Jenkins and his wife purchased a barbershop on East Livingston Avenue. In April 2017, appellant, a licensed barber, began renting a chair in the Jenkins' barbershop.

{¶ 5} Gail Heard-Frazier lived next door to the barbershop and was acquainted with appellant. On September 30, 2017, she was in her home when she heard a single gunshot, followed by "six more." (Tr. at 189.) She opened her front door and saw appellant standing in the middle of the street holding a pistol and "shouting about they tried to take his child away from him." *Id.* at 191. Appellant then went inside the barbershop.

{¶ 6} Columbus Police Officers Kevin Yankovich and Aaron McDonald were separately dispatched to the carry-out located across the street from the barbershop on a reported shooting. Yankovich was the first to arrive; he entered the store and observed a man bleeding on the floor. The man had what appeared to be a gunshot wound to the leg; he was "in and out of consciousness" and unable to answer questions. *Id.* at 155. Several persons inside the carry-out told Yankovich that the suspected shooter was in the barbershop located across the street. Yankovich did not see a weapon inside the carry-out.

{¶ 7} When McDonald arrived at the scene, Yankovich directed him to the barbershop. Appellant was standing outside; McDonald patted him down and took him into custody. As a result of the patdown, McDonald recovered a bag of marijuana, a gun clip, and a holster. No weapons were recovered from appellant's person.

{¶ 8} Matt Tschirner, a firefighter/paramedic with the Columbus Fire Department, responded to the scene of the shooting. Upon arrival, he observed a trail of blood leading from the barbershop to the carry-out. Tschirner entered the carry-out and observed a man bleeding on the floor. The man was barely conscious; his speech was incomprehensible. Tschirner observed gunshot wounds in the man's left thigh and right calf. Despite

Tschirner's emergency treatment, the man died on the way to the hospital.  Tschirner did not observe any weapons on the man or in or around the area of the carry-out.

{¶ 9}  On September 30, 2017, Columbus Police Detective Lisa Swisher of the Crime Scene Search Unit ("CSSU") photographed and collected evidence from both the carry-out and the barbershop.  The evidence collected included three spent shell casings found in the backyard outside the rear exit of the barbershop, and an unloaded gun and loaded gun clip found on the counter inside the barbershop.  Thereafter, on October 5, 2017, Columbus Police Detective Yvonne Taliaferro of the CSSU collected five spent shell casings from the area outside the rear exit of the barbershop.

{¶ 10}  Amy Amstutz, a forensic scientist in the firearms section of the Columbus Police Crime Laboratory, test-fired the gun recovered from the barbershop and found it to be operable.  Upon testing, she determined that the eight shell casings recovered from the scene were fired from that gun.

{¶ 11}  Dr. John A. Daniels, a deputy coroner and forensic pathologist in the Franklin County Coroner's Office, performed an autopsy on Jenkins on October 2, 2017 and issued a report of his findings.  According to Dr. Daniels, Jenkins died from a gunshot wound to his left lower thigh that nicked the popliteal artery, causing him to bleed to death.  He further noted two additional gunshot wounds–one to the left thigh and one to the right lower leg.  Dr. Daniels determined the manner of death to be homicide.

{¶ 12} Columbus Police Detective Eric Wooten, the lead detective in the case, interviewed appellant following his arrest; the interview was videotaped. Over appellant's objection, the state played the videotaped interview for the jury.  (State's Ex. B1.)  During the interview, appellant asserted that he rented a chair in Jenkins' barbershop, and that Jenkins allowed him to live there. On September 30, 2017, Jenkins appeared at the barbershop to collect rent money appellant owed him.  Appellant admitted that he (appellant) had a gun on him at the time.  The two men began arguing; the verbal argument soon turned physical.  The fight escalated; they eventually ended up on the ground in the backyard of the barbershop. Jenkins got on top of appellant and tried to take appellant's gun from him. Appellant fired three shots. Two hit Jenkins in the legs–one hit Jenkins as he attempted to climb a fence. The third shot hit Jenkins' car.  Jenkins then ran through the barbershop into the carry-out across the street.  Appellant thought Jenkins wanted

appellant to follow him so that Jenkins could shoot appellant in the carry-out. Appellant followed Jenkins, but stopped in the middle of the street and yelled at Jenkins to come out of the store. Appellant stated that had Jenkins come out of the carry-out with a gun, appellant would have shot at him again. When Jenkins did not emerge from the carry-out, appellant went back into the barbershop, unloaded his gun, removed the clip, and placed them on the counter. He then waited for the police to arrive.

{¶ 13} At trial, appellant testified on his own behalf. According to appellant, he first met Jenkins when the two were incarcerated in federal prison in 2001. Appellant was released from prison in 2006 and became a licensed barber in 2009. In April 2017, at Jenkins' request, appellant began working in Jenkins' barbershop; Jenkins also permitted appellant to live there. Appellant paid Jenkins a weekly fee to cover his barber chair rental and his living arrangement. Jenkins suggested that appellant sell heroin, cocaine, and other controlled substances out of the barbershop. Appellant declined to do so because he had already gone to prison for selling cocaine and did not want to "put [himself] in jeopardy." *Id.* at 379. He admitted, however, that he sold marijuana. Jenkins sold appellant a gun so that appellant could protect himself from crime in the neighborhood.

{¶ 14} Prior to the day of the shooting, Jenkins and appellant sometimes argued about landlord/tenant issues. On the day of the shooting, Jenkins entered the barbershop and started rummaging through appellant's personal belongings. Appellant assumed Jenkins was searching for rent money. Appellant wanted to get Jenkins out of the barbershop, so he told him he would pay him outside. Appellant walked out the back door; Jenkins remained inside. Appellant put the rent money in Jenkins' truck and went back inside the barbershop. Appellant averred Jenkins was "still argumentative," so appellant retrieved the money from the truck, gave it to Jenkins, and asked him to leave. *Id.* at 388. Jenkins then pushed appellant out the back door; appellant pushed him back, and the two began fighting. Appellant noted that Jenkins was "heavyset [and] knows how to fight." *Id.* at 393.

{¶ 15} At some point, Jenkins ended up on the ground. Appellant tapped him on the head and told him he did not want to fight. Jenkins then "attacked" appellant and reached for the gun appellant was carrying. *Id.* at 395. Appellant felt he needed to defend

himself because he thought Jenkins was going to take his gun and shoot him with it. Indeed, appellant testified that "I was in fear of my life at the time." *Id.* at 396.

{¶ 16} According to appellant, the struggle for the gun lasted two or three minutes. Appellant eventually gained control of the gun and pointed it at Jenkins. When Jenkins lunged for the gun, appellant shot him in the left leg. He thought shooting him in the leg would end the struggle for the gun; however, Jenkins stood up and began "[m]ean mugging" (staring) at appellant. *Id.* at 399. Because Jenkins acted like he had not been shot, appellant thought the bullet must have missed him. Jenkins again reached for appellant's gun; appellant shot him again, this time in the right leg. Appellant averred that he shot Jenkins the second time to keep Jenkins from harming him. Apparently realizing he had been shot, Jenkins started running; appellant did not shoot at Jenkins while he was running away.

{¶ 17} Appellant averred that he knew Jenkins owned several guns, and "I just believed he had a gun, and I didn't have nowhere to go. I couldn't retreat or run from the incident." *Id.* at 400-01. According to appellant, Jenkins ran in circles around the backyard and then ran toward the fence; he made several unsuccessful attempts at climbing the fence while looking back at appellant. At this point, appellant did not feel threatened or fear for his safety, so he did not feel that it was necessary to retreat. However, Jenkins soon ran toward appellant and tried to "ram" him. *Id.* at 404. Appellant did not feel the need to retreat because he was in his own home; however, when Jenkins got close to him, appellant shot him in the leg a third time because he "believed he must be trying to get my gun or trying to react or do something to me. I'm like 'Bro, I shot you two times, and you still attacking me after I shot you two times.' " *Id.* at 405.

{¶ 18} Jenkins then ran inside the barbershop and stood at the front door for about one minute. Appellant did not feel as if he was in danger at this point, so he did not fire any additional shots at Jenkins. Jenkins then ran out the front door. Shortly thereafter, appellant walked outside and stood in the middle of the street, anticipating the arrival of the police. Appellant still had his gun and began screaming "about the situation." *Id.* at 412. Appellant was scared because he did not know how Jenkins' friends or neighbors would respond to him shooting Jenkins; he went outside because he was aware of a nearby

city crime camera and wanted any encounter with Jenkins or others to be captured on videotape.

{¶ 19} Appellant eventually went back inside the barbershop. He walked out the back door and fired a shot at Jenkins' truck. When he heard police sirens, he went back inside, emptied the gun of bullets, and removed the clip. He placed these items on the counter because he did not want the police to perceive him as a threat when they arrived.

{¶ 20} After he was taken into custody, he agreed to an interview because he did not want the police to think he was "hiding something." *Id.* at 417. According to appellant, "I was just trying to bring some closure to the case, and I didn't want [Wooten] to think that I intended to kill [Jenkins]." *Id.*

{¶ 21} Appellant testified that he was never angry at Jenkins, he just "reacted in fear to defend [myself]." *Id.* at 418. Indeed, appellant averred that "[e]very time [I] shot Damon Jenkins, [I] did it to protect [my] life * * * [b]ecause [I] really believed that he was going to get [my] gun and kill [me]." *Id.*

{¶ 22} Appellant admitted that he shot Jenkins; he expressed remorse over killing him. Indeed, he averred that he "didn't intend to kill him and do this to his family" and that "I know if you shoot somebody, you got the intent to die, but I didn't expect him to die." *Id.* at 377-38.

{¶ 23} On cross-examination, the state questioned appellant extensively about inconsistencies between his trial testimony and the information he provided Wooten in the interview. Although he admitted that he failed to mention certain details during the interview, he averred that he was truthful during both the interview and at trial. When questioned as to why the photographs taken of him during the interview did not depict any injuries to his hands or face, appellant explained that he "never hit [Jenkins] and there wasn't no fight; it was more of a wrestle * * * with an attempt to snag my gun from the waistline." *Id.* at 434. He averred he shot Jenkins three times because he "was in fear for my life that he was going to get the gun and kill me." *Id.* at 435. When asked why he did not leave the backyard after he twice shot Jenkins, he averred he "was still in fear for my life, and Jenkins had a gun." *Id.* at 437.

{¶ 24} Following deliberations, the jury returned verdicts finding appellant not guilty of murder as charged in Count 1 of the indictment (purposeful murder), but guilty of

murder as charged in Count 2 of the indictment (felony murder), as well as the attached firearm specification, and guilty of having weapons while under disability as charged in Count 3 of the indictment. By judgment entry filed June 15, 2018, the trial court sentenced appellant to an aggregate prison term of 18 years to life.

{¶ 25} On appeal, appellant sets forth two assignments of error for this court's review:

> I.　　THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF MURDER AND HAVING WEAPONS WHILE UNDER DISABILITY AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II.　THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUION BY REQUIRING HIM TO APPEAR AT ALL STAGES OF HIS JURY TRIAL IN HANDCUFFS AND LEG SHACKLES.

{¶ 26} In his first assignment of error, appellant contends his convictions for murder and having weapons while under disability are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶ 27} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson,* 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion

reached by the trier of fact." *State v. Patterson,* 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 32, citing *State v. Treesh,* 90 Ohio St.3d 460, 484 (2001).

{¶ 28} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the state's evidence is to be believed, but whether, if believed, the evidence supports the conviction. *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston,* 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). "Further, 'the testimony of one witness, if believed by the jury, is enough to support a conviction.' " *Patterson* at ¶ 33, quoting *State v. Strong,* 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 29} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson* at ¶ 34, citing *Thompkins* at 387, citing *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 30} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge,* 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury * * * 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.,* quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witnesses credibility." *State v. Albert,* 10th Dist. No. 14AP-30, 2015-Ohio-249, ¶ 14, citing *State v. Redman,* 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26. "Mere disagreement over the credibility of the witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds."

*State v. Harris,* 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, citing *State v. G.G.,* 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 31} At the outset, we note that although appellant's assignment of error purports to challenge his conviction for having weapons while under disability, he offers no argument related to that conviction. A party asserting error on appeal bears the burden of affirmatively demonstrating such error. *James v. My Cute Car, LLC,* 10th Dist. No. 16AP-603, 2017-Ohio-1291, ¶ 10, citing *Lundeen v. State Med. Bd. of Ohio,* 10th Dist. No. 12AP-629, 2013-Ohio-112, ¶ 16. Pursuant to App.R. 12(A)(2), an appellate court may disregard a party's assignment of error (or in this case, a portion of a party's assignment of error), if the party fails to argue that assignment of error (or portion thereof) separately in the brief, as required by App.R. 16(A). *Id.,* citing *Morgan v. Ohio State Univ. College of Dentistry,* 10th Dist. No. 13AP-287, 2014-Ohio-1846, ¶ 64. It is the appellant's duty to construct the legal arguments necessary to support an assignment of error. *Id.,* citing *Cook v. Ohio Dept. of Job & Family Servs.,* 10th Dist. No. 14AP-852, 2015-Ohio-4966, ¶ 40. It is not an appellate court's duty to search the record for evidence to support an appellant's argument as to alleged error. *Id.,* citing *State ex rel. Petro v. Gold,* 166 Ohio App.3d 371, 2006-Ohio-943, ¶ 51 (10th Dist.) Appellant's brief does not contain any argument with citations to authorities, statutes, or relevant portions of the record regarding his having weapons while under disability conviction. Accordingly, pursuant to App.R. 12(A)(2), we disregard appellant's challenge to that conviction.[1]

{¶ 32} As noted above, the jury returned a verdict finding appellant guilty of felony murder as charged in Count 2 of the indictment (i.e., as a proximate result of committing the predicate offense of felonious assault) as well as the attendant firearm specification, which added a mandatory three-year term of imprisonment to his sentence. The felony murder statute, R.C. 2903.02(B), states in part: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of

---

[1] We note, however, that any such challenge to the having weapons under disability conviction would have been unsuccessful. R.C. 2923.13(A)(3) states in part: "Unless relieved from disability under operation of law or legal process, no person shall knowingly * * * use any firearm * * * if * * *[t]he person * * * has been convicted of any felony offense involving the illegal * * * distribution [of] any drug of abuse." Appellant admitted that he shot Jenkins with a firearm and had previously been convicted of selling cocaine. In addition, Wooten identified State's Ex. G1 and G2 as certified copies of appellant's 2002 federal felony conviction for distribution of more than five grams of crack cocaine.

violence that is a felony of the first or second degree." R.C. 2903.11(A)(2) defines felonious assault in part as follows: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon." As pertinent here, felonious assault is a felony of the second degree. R.C. 2903.11(D)(1). R.C. 2941.145(A) permits imposition of a three-year mandatory prison term where, as relevant here, the offender "had a firearm on or about the offender's person * * * [and] used it to facilitate the offense."

{¶ 33} Appellant essentially concedes that the state's evidence, if believed, is sufficient to support his conviction for felony murder with a firearm specification beyond a reasonable doubt. Appellant does not argue that appellee failed to produce evidence to establish all the essential elements of these offenses. Appellant admits that he shot and killed Jenkins. Appellant instead argues that his testimony establishes that he did so in self-defense. Accordingly, we must evaluate appellant's argument under the manifest weight of the evidence standard rather than the sufficiency of the evidence standard. *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 21. When reviewing an accused's contention that evidence supports a claim of self-defense, " ' "the manifest-weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability." ' " *Id.,* quoting *State v. Montanez*, 8th Dist. No. 10013, 2014-Ohio-1723, ¶ 41, fn. 5, quoting *State v. Wilson*, 8th Dist. No. 97350, 2012-Ohio-1952, ¶ 39.

{¶ 34} Self-defense is an affirmative defense. *State v. Goff,* 128 Ohio St.3d 169, 2010-Ohio-6317, ¶ 36. To establish self-defense using deadly force, an accused must prove by a preponderance of the evidence: (1) he was not at fault in creating the situation giving rise to the altercation; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape was the use of force; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Lammkin*, 10th Dist. No. 18AP-398, 2019-Ohio-682, ¶ 18, citing *State v. Barnes,* 94 Ohio St.3d 21, 24 (2002). The elements of self-defense are cumulative. *State v. Kean,* 10th Dist. No. 17AP-427, 2019-Ohio-1171, citing *State v. Jackson,* 22 Ohio St.3d 281, 284 (1986). Accordingly, if an accused fails to prove any one of the elements by a preponderance of the evidence, he fails to demonstrate that he acted in self-defense. *Lammkin* at ¶ 18.

{¶ 35} Relying exclusively on his own testimony at trial, appellant contends he proved all three elements of his self-defense claim by a preponderance of the evidence. Appellant first asserts that his testimony established that he was not at fault in creating the situation that gave rise to the altercation; rather, Jenkins initiated the altercation by physically assaulting and threatening him. Appellant further avers that his testimony established that he had a bona fide belief that he was in imminent danger of death or great bodily harm. Appellant claims that even after he initially shot Jenkins in the leg, Jenkins continued to assault him and attempt to seize his gun. According to appellant, each time he shot Jenkins, he did so because he feared for his life, as he thought Jenkins would get his gun and shoot him with it. Finally, appellant contends his testimony established that he did not violate any duty to retreat because the incident occurred in his own home.

{¶ 36} After careful consideration of the record in its entirety, we find that the jury, as trier of fact, reasonably could have rejected appellant's version of the events and concluded that appellant did not establish the elements of his self-defense claim by a preponderance of the evidence. Whether Jenkins, rather than appellant, initiated the altercation, whether appellant shot Jenkins because he feared Jenkins would wrestle appellant's gun from him and shoot him with it, and whether appellant had no duty to retreat because he was in his own home, were questions for the jury to consider. The jury was free to believe or disbelieve any or all of the testimony appellant provided on these issues. *Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942 at ¶ 31, citing *State v. Jackson*, 06AP-1267, 2008-Ohio-1277, ¶ 11.

{¶ 37} There were no witnesses to the struggle between appellant and Jenkins. The jury reasonably could have determined that appellant initiated the altercation with Jenkins, despite appellant's testimony that Jenkins did so. Further, even if the jury concluded that Jenkins was the initial aggressor, the evidence failed to support a finding that appellant had reasonable grounds to believe there was an imminent threat of death or serious bodily harm. More significantly, the weight of the evidence simply did not demonstrate that the use of deadly force by appellant, who suffered no apparent injury during the altercation, was warranted under the circumstances and proportionate to the perceived threat.

{¶ 38} Moreover, appellant's testimony was inconsistent as to the reason he feared being shot. In both opening statement and closing argument, defense counsel argued that

appellant shot Jenkins in self-defense because Jenkins attempted to wrestle appellant's gun from him, presumably to shoot him with it. Appellant stated as much in his interview with police the day of the shooting; he also testified to that effect at trial. However, at trial, appellant also averred that he feared for his life because Jenkins had a gun. He did not mention this fact during his interview on the day of the shooting. This inconsistent testimony provided the jury with a reasonable basis to question appellant's credibility. "Though appellate courts must sit as a 'thirteenth juror' when considering a manifest weight argument, it must also give great deference to the trier of fact's determination on the credibility of the witnesses." *Kurtz* at ¶ 31, citing *State v. Favor,* 10th Dist. No. 08AP-215, 2008-Ohio-5371, ¶ 10. Further, appellant's assertion that Jenkins had a gun is not supported by the evidence. Yankovich testified that he did not observe a weapon inside the carry-out; Tschirner testified that Jenkins did not have a weapon on his person and he did not see a weapon in or around the area of the carry-out. Instead, the evidence established that the only gun recovered in connection with the shooting was the one with which appellant shot Jenkins.

{¶ 39} As to the duty to retreat requirement, we note that the evidence in this case, including the testimony offered by appellant, established that he shot Jenkins in the backyard of the barbershop. Before using deadly force in self-defense, a person must first use any reasonable means of retreat when attacked outside the confines of his or her own home. *State v. Johnson,* 10th Dist. No. 06AP-878, 2007-Ohio-2792, ¶ 44, citing *State v. Thomas,* 77 Ohio St.3d 323, 326-27 (1997). Even if the jury accepted appellant's claim that he lived in the barbershop, the fact remains that appellant shot Jenkins outside the confines of his home. Thus, the jury could have reasonably determined that appellant did not use any reasonable means of retreat before using deadly force against Jenkins. Appellant testified that after the initial struggle with Jenkins, he maintained control of the gun and then pointed it at Jenkins. At this point, Jenkins was unarmed. Although the record does not reflect the exact timeframe between appellant's gaining control of the gun and Jenkins' attempt to grab it, the jury reasonably could have concluded that appellant had the opportunity to retreat from the area before using deadly force.

{¶ 40} Because the jury was in the best position to determine appellant's credibility by assessing his manner and demeanor as he testified, and by taking into account

inconsistencies in his trial testimony, as well as inconsistences between his trial testimony and the statement he made to police on the day of the shooting, we cannot conclude, on this record, that the jury clearly lost its way in rejecting appellant's claim of self-defense. Accordingly, appellant's murder conviction is not against the manifest weight of the evidence. Therefore, appellant's first assignment of error is overruled.

{¶ 41} In his second assignment of error, appellant contends the trial court abused its discretion by requiring him to appear in handcuffs and leg shackles during all stages of his jury trial.

{¶ 42} At the outset of trial, prior to voir dire, the following colloquy occurred:

> THE COURT: As a preliminary matter, Mr. Reynolds, I want to address you directly. This is your trial. It's your time to hear the evidence against you, to present the best defense you can. The State has to prove the case against you.
>
> It's been brought to my attention that there's been some issues in the jail with your behavior. If you misbehave out here, I'll remove you from the courtroom and your trial goes on. It's to your benefit not to have any issues out here. It only makes a bad impression on the jury if you do that.
>
> I would encourage you to obey the rules of the courtroom. You can't talk out loud. No outbursts. Comply with the deputies. You shouldn't be looking around the courtroom other than looking at the jury and whatever else your lawyer told you.
>
> Are you going to be able to abide by those instructions, sir?
>
> THE DEFENDANT: Yes, sir, but --
>
> [DEFENSE COUNSEL]: He wants to address the Court. I advised him not to talk about his case.
>
> THE COURT: You can talk to me if you want, but it's probably not good to talk about the details of your case. We're getting ready to start your jury trial.
>
> First of all, let's deal with, you know, are you going to be able to obey my instructions and comply with the deputies?
>
> THE DEFENDANT: Yes, sir.

(Tr. at 92-93.)

{¶ 43} After a brief discussion with appellant pertaining to his concerns about defense counsel's representation, the court addressed issues regarding appellant's wearing of handcuffs and leg shackles during trial:

> THE COURT:  * * * Deputies, do you want the handcuffs kept on him?
>
> A DEPUTY:  Yeah.
>
> THE COURT:  We need to make a record for that.
>
> So it's my understanding there's been some spitting issues, is that correct?
>
> A DEPUTY:  Correct.
>
> THE COURT:  There's also been issues of threats against you and other deputies, is that correct?
>
> A DEPUTY:  Correct.
>
> THE COURT:  What other misbehavior has there been? Anything else?
>
> A DEPUTY:  I think that's it.
>
> THE COURT:  Do you feel it's necessary to have the handcuffs on him as an additional measure of security in the courtroom to control his behavior?
>
> A DEPUTY:  Yes, I do.
>
> THE COURT:  And he's got shackles on, is that correct?
>
> A DEPUTY:  Correct.
>
> THE DEFENDANT:  That's what you've got a question about?
>
> THE COURT:  Hold on.
>
> [DEFENSE COUNSEL]:  Your honor, I would object to having the handcuffs and shackles.  The handcuffs are obviously visible.  I want my client to be able to write notes, if there are questions he has, to assist in his defense or suggestions, strategic things I want him to point out to me.

He can't hide his hands the whole time. It's prejudicial for the jury to be aware that he's in handcuffs and in custody. The shackles are very loud.

THE COURT: Nobody gets their shackles off during the trial, and we can put a stun gun on him if we had to.

[DEFENSE COUNSEL]: I don't think that's necessary. I'm just objecting to the handcuffs and the shackles.

Thank you.

THE COURT: What about the handcuffs? Do you guys still think that the handcuffs are necessary?

A DEPUTY: I believe they are, Your Honor.

THE COURT: All right. We're going to leave the handcuffs on over your objection. If you want me to address the jury if you think it's prejudicial, I'll tell them to disregard it.

[DEFENSE COUNSEL]: I would request that.

Thank you.

THE COURT: Let's be real. Most people know that when two deputies are in the courtroom - - the jury is not stupid - - then he's in custody. I can give them a curative instruction.

*Id.* at 94-97.

{¶ 44} After a brief discussion on other matters, the prosecutor informed the court that appellant had an unrelated harassment case pending against him. The court inquired:

THE COURT: This is a bodily substance harassment?

[THE PROSECUTOR]: It is.

THE COURT: It supports my thoughts of why he's currently in handcuffs. He is in handcuffs because he spit at law enforcement.

*Id.* at 103.

{¶ 45} Prior to the commencement of proceedings on the second day of trial, outside the presence of the jury, defense counsel requested that the trial court reconsider its ruling

on the issue of appellant being handcuffed during the trial.  The following discussion was held:

> [DEFENSE COUNSEL]:  * * * I'm respectfully requesting the Court to reconsider its ruling on removing Mr. Reynolds' handcuffs.  He's been polite.  He's got shackles on.  The only person who he could potentially hurt in the vicinity is me.  I'm just asking that you consider removing the handcuffs.  It just makes him look bad.
>
> Thank you.
>
> THE COURT: Well, they already know he has them on.
>
> [DEFENSE COUNSEL]: I know that.
>
> THE COURT:  We talked about it.
>
> [DEFENSE COUNSEL]:  Just respectfully requesting you to reconsider.  That's all.
>
> THE COURT [to a courtroom deputy]:  What do you think?
>
> THE DEPUTY:  We stand on what we said yesterday.
>
> THE COURT:  I am going to maintain my ruling.  There's been issues in the past.  Yes, he's been behaved.  I'm glad that he has.  It's to his benefit that he continue to do that.  But I've seen him.  He's able to go through his papers.  He's able to make notes. I've seen him do it throughout the trial. I'm going to maintain my ruling.

*Id.* at 182-83.

{¶ 46} Appellant contends the trial court abused its discretion by requiring him to wear handcuffs throughout the trial.[2]  More particularly, appellant argues: (1) during the pre-trial suppression hearing, he caused no disruptions or problems which would have caused the trial court to conclude that he would misbehave at trial; (2) immediately prior to trial, he agreed to follow the court's directives; (3) once trial began, he behaved appropriately; (4) the court failed to provide a requested curative instruction; and (5) the

---

[2]  Although appellant's assignment of error references both leg shackles and handcuffs, his argument focuses primarily on the trial court's decision to order appellant to wear handcuffs throughout the trial.

trial court mentioned using a stun belt but did not appear to seriously consider it as an alternative to handcuffs.

{¶ 47} With respect to physical restraints such as handcuffs that are visible to the jury, the Supreme Court of Ohio has recognized that " 'no one should be tried while shackled, absent unusual circumstances.' " *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 104, quoting *State v. Kidder,* 32 Ohio St.3d 279, 285 (1987). This is the accepted practice because the presence of restraints tends to erode the presumption of innocence. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 79, citing *State v. Carter*, 53 Ohio App.2d 125, 131 (4th Dist.1977). The use of restraints can also interfere with an accused's ability to participate in his own defense. *State v. Black*, 10th Dist. No. 16AP-405, 2017-Ohio-3001, ¶ 7, citing *Deck v. Missouri,* 544 U.S. 622, 624 (2005). However, the right to remain free of visible physical restraints " 'may be overcome in a particular instance by the need for physical security, escape prevention, or courtroom decorum.' " *State v. Williams*, 10th Dist. No. 15AP-48, 2016-Ohio-4550, ¶ 118, quoting *Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 153.

{¶ 48} The decision to use physical restraints on a defendant is left to the sound discretion of the trial court because it is in a position to consider the accused's actions both inside and outside the courtroom. *Franklin* at ¶ 79, citing *State v. Richey*, 64 Ohio St.3d 353, 358 (1992). However, a trial court must actually exercise its own discretion and not leave the issue up to security personnel without inquiring into the specific circumstances upon which officials' security concerns are based. *Adams* at ¶ 104; *State v. Chester,* 10th Dist. No. 08AP-1, 2008-Ohio-6679, ¶ 7.

{¶ 49} The Supreme Court of Ohio encourages, but does not require, trial courts to hold a hearing before ordering restraints for an accused. *State v. Boone,* 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 17, citing *State v. Neyland,* 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 92-94. "Where the facts and circumstances surrounding a defendant illustrate a compelling need to impose exceptional security procedures, the trial court's exercise of discretion in this regard should not be disturbed unless its actions are not supported by the evidence before it." *Franklin* at ¶ 82. The record should indicate factors upon which the trial court exercised its discretion. *Chester* at ¶ 7, citing *State v. Jones,* 10th Dist. No. 02AP-

1390, 2003-Ohio-5994, ¶ 24. Accordingly, there is no per se error when a trial court fails to hold a hearing to address its security concerns. *Boone* at ¶ 17.

{¶ 50} Here, even without a hearing, the trial court's reasons for imposing handcuffs are clear from the record. A courtroom deputy informed the trial court of threats appellant allegedly made against that deputy and other deputies. In addition, the trial court noted that appellant had spit on law enforcement personnel. While the record does not reveal the exact nature of appellant's threats or in what context the spitting occurred, in light of the circumstances facing the trial court, we cannot find that it abused its discretion in requiring appellant to wear handcuffs throughout the trial. Further, the trial court was not obliged to consider appellant's conduct at the suppression hearing or accept appellant's assurance that he would behave appropriately during the trial. "A trial court need not sit by helplessly waiting for a defendant to commit a violent or disruptive act in the courtroom before being cloaked with the power to invoke extra security measures." *Id.* at ¶ 18, citing *Franklin* at ¶ 79.

{¶ 51} In addition, we cannot find an abuse of discretion in the trial court's failure to order use of a stun belt rather than handcuffs. Defense counsel stated that he did not believe a stun belt was necessary under the circumstances.

{¶ 52} Finally, although the better practice may have been for the trial court to provide the jury with a specific curative instruction advising it that appellant appearing in handcuffs should not bear on his guilt or innocence, we find no abuse of discretion in the trial court's failure to do so. The court instructed the jury, prior to opening statements, that appellant was "presumed innocent until, if ever, the State of Ohio rebuts that presumption and proves him guilty beyond a reasonable doubt of all of the elements of the offense." (Tr. at 109.) We presume the jury followed the trial court's instructions. *State v. Walker*, 10th Dist. No. 17AP-588, 2019-Ohio-1458, citing *State v. Morock*, 10th Dist. No. 14AP-559, 2015-Ohio-3152, ¶ 18.

{¶ 53} Morever, even assuming the trial court abused its discretion in ordering appellant to wear handcuffs, any such error was harmless as appellant cannot demonstrate prejudice where the record fails to suggest that the wearing of handcuffs affected the outcome of the trial. *State v. Mendoza*, 10th Dist. No. 16AP-893, 2017-Ohio-8977, ¶ 58. The record does not suggest that the handcuffs inhibited appellant's ability to confer with

counsel regarding his own defense. *Id.*, citing *Chester*, 10th Dist. No. 08AP-1, 2008-Ohio-6679, ¶ 14. As reflected in the transcript portions cited above, the trial court observed appellant during the trial and noted that his handcuffs did not impede his ability to "go through his papers" and "make notes." (Tr. at 183.) Additionally, there is no evidence that the use of handcuffs contributed to any increase in anxiety that might have materially prejudiced or impaired appellant's right to testify on his own behalf. *State v. Hughes,* 10th Dist. 14AP-360, 2015-Ohio-151, ¶ 27, citing *Chester*.

{¶ 54} For the foregoing reasons, we overrule appellant's second assignment of error.

{¶ 55} Having overruled appellant's first and second assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER and DORRIAN, JJ., concur.

———————————————