[Cite as *Dennison v. Dennison*, 2020-Ohio-2800.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Sallynda P. Rothchild Dennison, | : | |
| Petitioner-Appellant, | : | |
| | : | No. 19AP-335 |
| v. | : | (C.P.C. No. 18DV-1954) |
| Allen P. Dennison, | : | (REGULAR CALENDAR) |
| Respondent-Appellee. | : | |

D E C I S I O N

Rendered on May 5, 2020

**On brief:** *Cabot Roubanes Luke Co., LPA, Barbara A. Luke*; and *Angela Miller*, for appellant. **Argued:** *Barbara A. Luke*.

**On brief:** *Sallynda P. Rothchild Dennison*, pro se.

**On brief:** *Isaac Wiles Burkholder & Teetor, LLC, Joanne S. Beasy*, and *Dale D. Cook*, for appellee. **Argued:** *Dale D. Cook*.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch.

KLATT, J.

{¶ 1} Petitioner-appellant, Sallynda Dennison, appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, and Juvenile Branch, denying her request for a domestic violence civil protection order ("CPO"). For the following reasons, we affirm.

{¶ 2} On November 30, 2018, appellant filed a petition for a CPO against her husband, respondent-appellee, Allen Dennison, pursuant to R.C. 3113.31. Following an ex

parte hearing, the trial court issued a temporary CPO and set the matter for a full hearing. After several continuances, during which the court maintained the temporary order, the matter was heard on April 17, 18, and 19, 2019.[1]  Both parties appeared with counsel and testified on their own behalf.

{¶ 3}    On April 23, 2019, the trial court filed an entry denying the CPO.  Appellant timely appeals, advancing a single assignment of error for this court's review:

> The court's decision denying Appellant Dennison a CPO is against the manifest weight of the evidence. R.C. 3113.31

{¶ 4}    Appellant's assignment of error contends that the trial court's decision denying her petition for a CPO is against the manifest weight of the evidence.  An appellate court will not reverse a trial court's decision regarding the issuance of a CPO for being contrary to the manifest weight of the evidence if there is some competent, credible evidence going to the essential elements of the case.  *J.R. v. E.H*, 10th Dist. No. 16AP-431, 2017-Ohio-516, ¶ 10, citing *Bradley v. Cox*, 10th Dist. No. 04AP-118, 2004-Ohio-4840, ¶ 9, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.  A reviewing court presumes that the trial court's findings are correct because the trial court has viewed the witnesses and weighed the credibility of the parties' testimony.  *Id.,* citing *Guthrie v. Long*, 10th Dist. No. 04AP-913, 2005-Ohio-1541, ¶ 13, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  " '[T]he weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact.' "  *Id.,* quoting *Guthrie* at ¶ 13, citing *State v. Jamison*, 49 Ohio St.3d 182 (1990).

{¶ 5}    To obtain a CPO pursuant to R.C. 3113.31, the petitioner must prove by a preponderance of the evidence that the respondent has engaged in an act of domestic violence against petitioner or petitioner's family or household members.  *Crabtree v. Dinsmoor*, 10th Dist. No. 13AP-342, 2013-Ohio-5797, ¶ 10, citing *Felton v. Felton,* 79 Ohio St.3d 34 (1997), paragraph two of the syllabus.  As relevant here, R.C. 3113.31(A)(1)(a)(ii) defines "[d]omestic violence" as "[p]lacing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 * * * of the Revised Code."

---

[1] Prior to opening statements, the trial court noted that the parties' divorce proceedings in case No. 18DR-3628 remained pending.

{¶ 6}   R.C. 2903.211(A)(1) addresses menacing by stalking and provides in part: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person."   Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist."  "Purpose or intent to cause physical harm or mental distress is not required. It is enough that the person acted knowingly."  *Jenkins v. Jenkins*, 10th Dist. No. 06AP-652, 2007-Ohio-422, ¶ 16.

{¶ 7}   R.C. 2903.211(D)(1) defines "[p]attern of conduct" as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents."   The incidents need not occur within any specific temporal period.  *Perry v. Joseph*, 10th Dist. No. 07AP-359, 2008-Ohio-1107, ¶ 7, citing *Jenkins* at ¶ 18.  " 'In determining what constitutes a pattern of conduct for purposes of R.C. 2903.211(D)(1), courts must take every action into consideration even if * * * some of the person's actions may not, in isolation, seem particularly threatening.' "  *J.W. v. D.W.*, 10th Dist. No. 19AP-52, 2019-Ohio-4018, ¶ 47, citing *Olson v. Olson,* 6th Dist. No. WD-15-002, 2016-Ohio-149, ¶ 14.

{¶ 8}   R.C. 2903.211(D)(2)(a) and (b) define "[m]ental distress," respectively, as "[a]ny mental illness or condition that involves some temporary substantial incapacity," or "[a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services."   " '[M]ental distress for purposes of menacing by stalking is not mere mental stress or annoyance.' "  *J.W.* at ¶ 48, quoting *Ellet v. Falk*, 6th Dist. No L-09-1313, 2010-Ohio-6219, ¶ 38, quoting *Caban v. Ransome*, 7th Dist. No. 08 MA 36, 2009-Ohio-1034, ¶ 29.  "However, it 'need not be incapacitating or debilitating.' "  *Id.*, quoting *Jenkins* at ¶ 19.  " '[E]xpert testimony is not required to find mental distress.  Lay testimony may be sufficient.' "  *Id.*, quoting *Jenkins.*  " 'A trial court may rely on its knowledge and experience in determining whether mental distress has been caused.' "  *Id.*, quoting *Jenkins* at ¶ 19.

{¶ 9} At the hearing, appellant testified that she and appellee were married in August 1993 and are the parents of two children–an adult son and a minor daughter. Appellant is an attorney; until mid-year 2018, appellee was the office manager at appellant's law firm. In March 2018, appellant became aware that appellee was having an extramarital affair with a member of appellant's staff. When confronted by appellant, appellee admitted the affair; he agreed to end it and go to marriage counseling. Appellant did not immediately terminate appellee's employment because he was an integral member of the support staff.

{¶ 10} In mid-May 2018, appellant learned that appellee had not ended the affair; she immediately ordered appellee to move out of the marital home. For the next three months, appellee stayed with friends who lived across the street. Despite appellant's repeated protestations, appellee returned to the marital home daily to shower, pick up clothing, do laundry, mow the lawn, or do "anything else he felt like doing." (Tr. at 76.) At one point, without appellant's permission, appellee entered the house, walked into the bathroom, and talked to appellant while she showered. Appellant averred that appellee's actions made her feel "[a]fraid" because "[t]here was zero restraint. He did what he wanted, when he wanted, the way he wanted no matter what I had to say about it." *Id.* at 77. Appellant averred that appellee told her he knew what was happening inside the house and what she was doing, and that what went on inside the house was his business. *Id.* at 34, 52. Appellant testified that she was "very stressed out" during this period, as she "felt that his purpose in living across the street was to harass me and upset me; and I felt like as long as he was there, I would never be allowed to live in peace in my own home." *Id.* at 39.

{¶ 11} From mid-May through the end of June 2018, the parties exchanged numerous text messages. In them, appellee averred that he would "respect [appellant's] wishes" and no longer enter the house without her permission. (Petitioner's Ex. 19.) He further stated that he had entered the house and "checked on you Friday," to which appellant replied, "I'm f***ing bleeding out[.] You don't understand what you've done." *Id.* During a discussion about appellee bringing the woman with whom he had the affair into the neighborhood, appellant averred, "[y]ou have emotionally burgeoned [sic] me to death * * * I am a big gaping wound * * * [and] [i]t's unlikely to ever heal." Appellee responded, "I regret that[.] * * * I'm sorry." *Id.*

{¶ 12} In early August 2018, appellee moved to Florida. Thereafter, he returned to Ohio often to visit the children. During a visit over the 2018 Labor Day weekend, appellee stayed with a friend who lived across the street from the marital home. On Monday, September 3, 2018, appellee sent appellant a text message indicating that he had been watching the marital home over the weekend and observed that their 15-year old daughter and a male had been alone and unsupervised at the house all weekend. In a responsive text, appellant denied that the daughter was alone with the man and told appellee that she needed to protect their children and herself from him and repeatedly ordered him "[s]tay out of my life." (Petitioner's Ex. 12; Tr. at 42.) Appellant testified that she had done everything she could to try to get away from appellee, but ultimately realized that he considered her to be his "property." (Tr. at 43.) Appellant averred that she felt threatened by appellee because she believed that he had "people watching me for him" and was "doing everything in his power to be where I'm going to be." *Id.* at 44.

{¶ 13} On March 1 and 2, 2019, appellant observed appellee at a bar and a grocery store that he knew she frequented. On March 3, 2019, appellee was arrested pursuant to appellant's allegation that he violated the temporary CPO by being at a neighbor's house which is less than 500 feet away from the marital residence.[2] Appellant averred that these incidents made her feel "nauseous, scared, like I was out of control of my life." *Id.* at 103. Appellant characterized her feelings as "mental distress" and averred that "[e]motionally, physically, it is beyond my ability to cope and I'm asking for help." *Id.* at 102-03.

{¶ 14} Appellant stated that she has attended weekly therapy sessions since May 2018, has been prescribed anti-anxiety medication, has had to increase her anti-depressant medication, and is in danger of having to be prescribed medication to lower her blood pressure. She further averred that although "it's been a year * * * I can still be reduced to tears. * * * I have said over and over again since he left that he's either going to kill me off from medical problems from stress or he's going to push me to the point where I'm suicidal or he's going to kill me." *Id.* at 53-54. Appellant testified that she cries every day, does not sleep well, and struggles to get up in the morning. Appellant averred that appellee is "very dangerous," and, as a result, appellant has installed security cameras inside and outside her

---

[2] At the time of trial, appellant's criminal case regarding the alleged violation of the temporary CPO was pending.

home, installed an alarm system, obtained a concealed carry permit so she can carry a gun, and notified the police in her area and security personnel at her office and the courthouse. *Id.* at 66.

{¶ 15} On cross-examination, appellant acknowledged that appellee left the marital residence at her request. She further conceded that over the next two months, appellee agreed to assist her with the house, vehicles, animals, and legal practice. She acknowledged that appellee's September 3, 2018 text message about watching the house related to his concern that their daughter was alone with a man appellant had hired to remodel the house.

{¶ 16} As to the events of March 1 and 2, 2019, appellant admitted that appellee was already at the locations when appellant arrived; he did not acknowledge her presence and left the establishments. Nonetheless, she felt scared, upset, nauseous, out of control, and frustrated by these encounters because she "was trying to figure out why everywhere I went, he was already there." *Id.* at 169.

{¶ 17} On redirect examination, appellant testified that she did not file for a CPO until November 30, 2018 because appellee had repeatedly assured her that he would stop doing the things she requested that he not do. When appellant realized appellee was not going to voluntarily comply with her requests, she concluded it was time to enlist the aid of the courts.

{¶ 18} Appellee testified that after appellant ordered him to leave the marital residence, he had time to pack only a few items. He stayed with friends across the street because the circumstances were urgent and other options were unsuitable; he did not do so because he wanted to stalk appellant. He made arrangements with appellant over the next few weeks to return to the house to retrieve personal items. He also agreed to continue performing household duties such as doing laundry, mowing the lawn, and transporting their daughter to activities. Although appellant initially asked appellee to leave the law firm in mid-May 2018, she asked him to return to work shortly thereafter. Appellant changed the locks on the marital home on June 2, 2018, and he did not return to the house thereafter.

{¶ 19} According to appellee, he never physically stalked or threatened appellant and "honestly went out of my way to not cause her mental distress." *Id.* at 233. He moved to Florida in early August 2018. When he returned to Ohio for the 2018 Labor Day

weekend, he stayed with his friends across the street from the marital home because it was free, close to his daughter, centrally located, and alleviated the need for a rental car. He never entered the marital home during his visits to Ohio. He texted appellant on September 3, 2018 to express his concern about their daughter being alone in the house with a male contractor who was working on the house. When appellant denied that the man was there and that what happened at the house was her business, appellee said he had seen the man's truck with his own eyes and that their daughter's safety was his only concern.

{¶ 20} In late June 2018, he returned to Ohio and again stayed with his friends across the street from the marital home. He denied that he brought his girlfriend into the neighborhood only to upset appellant. He had no communication with appellant after September 19, 2018. He did not see appellant until the October 30, 2018 court date in their pending divorce. He returned to Ohio for Thanksgiving 2018 and stayed in Gahanna; he had no communication with appellant during this trip. He returned to Ohio on December 1, 2018 to attend a party at the home of a friend who lived near the marital home. He neither saw nor spoke to appellant while in Ohio. He was served with the CPO at the party and left immediately thereafter. He returned to Ohio in January 2019; he neither saw nor physically stalked appellant during this trip.

{¶ 21} On March 1, 2019, he went to a bar with his son and some friends. He denied that appellant frequented this particular bar. Appellant entered the bar approximately an hour and half after he arrived; he paid his tab and left immediately without speaking to her. He accompanied his son to a grocery store on March 2, 2019; he did not see appellant at the store. Later that evening, he met friends at a bar. Appellant entered the bar approximately one hour later; he left immediately. He denied watching the marital home, telling appellant he was doing so, or asking anyone to do so for him.

{¶ 22} On cross-examination, appellee conceded that his son told him to stay away from the marital home because his presence in the neighborhood or any discussion of him upset appellant. He also acknowledged that appellant stated in a text that he had emotionally bloodied her, and he agreed that he had done so. (Petitioner's Ex. 19.) On redirect, he stated that the "emotionally bloodied" text was in reference to his infidelity.

{¶ 23} Anna Reda testified on rebuttal in appellant's case. Reda lives in appellant's neighborhood and works at her law firm. She confirmed that appellee was at the bar and

grocery store on March 1 and 2, 2019 when appellant was there. She further stated that appellee had successfully alienated appellant from some of the neighbors and that appellee's actions in twice bringing his girlfriend into the neighborhood caused appellant mental distress.

{¶ 24} At the conclusion of the hearing, the trial court, addressing appellant, averred, "there is no question in my mind that you've been through and are going through an enormously traumatic experience because we have in fact seen some evidence of inappropriate behavior and evidence of a very dysfunctional family. However, the crux of what we're here to do is to decide whether or not a protection order is appropriate." (Tr. at 362.) The court further stated, "[o]ne legal issue that the Court doesn't have a quick answer to is that the petition was signed and filed in November [2018], yet the majority of the evidence, if not all of the evidence, of potential behavior by the Respondent took place after November. So if the Court with hindsight finds that the ex parte order wasn't appropriate, then the Court would be looking at evidence subsequent. I don't know that answer; and if I'm going to fault, I'm going to fault on behalf of the Petitioner. And I am considering very much the evidence of events that occurred after the filing of the petition." *Id.* The court continued, "[T]he crux of the matter [is] has the behavior of the Respondent given rise to the need to issue a civil protection order[?] After hearing from both parties as well as the witness, after reviewing a multitude of exhibits, this Court specifically finds that there is insufficient evidence for the maintenance of a civil protection order and the same is denied." *Id.* at 363.

{¶ 25} In her assignment of error, appellant first asserts that the trial court "found that the element of mental distress was met." (Appellant's Brief at 9.) In support of this argument, appellant cites the trial court's statement that she had been through an "enormously traumatic experience." We disagree with appellant's characterization of the trial court's assertion. The court did not specify the source, cause, or timeframe of the "traumatic experience," and, given the extensive evidence presented by appellant regarding issues only tangentially related to the request for the CPO, such as the history and dynamics of the parties' 25-year marriage, appellee's alleged multiple infidelities, and other salacious details of appellee's past behavior, the court's statement may simply have been an acknowledgement that the parties' imploding marriage and pending divorce was a

traumatic experience for appellant. Moreover, a trial court speaks through its journal entry, not by oral pronouncement. *State v. Smith*, 10th Dist. No. 17AP-573, 2018-Ohio-3875, ¶ 7. In its April 23, 2019 judgment entry, the court averred only that after observing the witnesses, assessing and weighing their credibility, and reviewing the entire file, including the exhibits submitted by both parties, appellant had failed to prove, by a preponderance of the evidence, that she was entitled to a CPO. The court did not specifically address any of the elements pertaining to the issuance of a domestic violence CPO based upon menacing by stalking. Even if the trial court found that appellant established that she suffered mental distress, the court may well have concluded that she did not establish by a preponderance of evidence, that appellee, by engaging in a pattern of conduct, knowingly caused the mental distress.

{¶ 26} To that end, appellant argues that the following evidence established that, following his exit from the marital home in mid-May 2018, appellee engaged in a pattern of conduct that was knowingly aimed at causing appellant mental distress: living across the street until he moved to Florida in early August 2018, bringing his girlfriend (appellant's former employee with whom appellee had an affair) to neighborhood gatherings, entering the marital home unannounced, telling appellant that what went on inside the marital home was his business, leaving three loaded guns in the house after appellant told him she was depressed and suicidal, intentionally alienating appellant from neighbors, ignoring his son's advice to stay away from the marital home, staying across the street from the marital home during visits to Ohio after he moved to Florida, and, on March 1 and 2, 2019, "show[ing] up" at public establishments appellee knew appellant often patronized. (Appellant's Brief at 11.) Appellant asserts that "[w]ithout doubt, [a]ppellee has engaged in the subtle, devious psychological warfare that constitutes domestic violence." *Id.* Appellant argues that she is battling high blood pressure, seeing a therapist, and taking psychotropic medications as a result of appellee's actions.

{¶ 27} The record reveals that appellee provided explanatory and/or contradictory testimony on nearly all of appellant's assertions regarding his actions and motivations. As a general matter, appellee denied that he physically stalked appellant or knowingly caused her mental distress. More specifically, he asserted that moving into his friend's house across the street was a temporary move necessitated by appellant's request that he leave the house

immediately. His abrupt exit from the marital home required that he return to retrieve clothing and other personal items, which occurred pursuant to arrangements with appellant. Further, at appellant's request, he continued to assist her with household tasks. He denied bringing his girlfriend to neighborhood gatherings to upset appellant; indeed, he tried to be discreet when he did so and stopped bringing her upon appellant's request. His assertions to appellant that he was watching the marital home and that what happened therein was his business stemmed from concerns about his daughter's safety. Other than that, he did not watch the house, never told appellant he was doing so, and never asked anyone else to do so. He left the guns in the same place in the marital home that they had been for years. When he returned to Ohio after moving to Florida, he stayed with friends in the neighborhood because it was free, centrally located, close to his daughter, and obviated the need for a rental car. As for the March 2019 incidents, he left the bars immediately after appellant arrived and did not speak to her; he accompanied his son to the grocery store and did not see appellant there. His son's advice about staying away from the house was not based upon an allegation that appellee was stalking appellant; rather, it stemmed from his son's assertion that appellant did not allow him to mention appellee's name and that she became upset at the mere sight of appellee. Although appellee did not specifically contradict the testimony regarding his alleged efforts to alienate appellant from the neighbors, we note that this testimony was provided by appellant's friend and current employee, Reda. The trial court, as finder of fact, was in the best position to determine Reda's credibility and was free to believe or disbelieve any or all of her testimony. *State v. Harmon*, 10th Dist. No. 18AP-965, 2020-Ohio-590, ¶ 37, citing *State v. Reynolds*, 10th Dist. No. 18AP-560, 2019-Ohio-2343, ¶ 36.

{¶ 28} The present case centers almost entirely on the credibility of the parties. The trial court essentially concluded that the testimony offered by appellee was more credible and reasonable than that offered by appellant. Although an appellate court is permitted to independently weigh the credibility of witnesses, it must afford great deference to the trial court's determination of witness credibility. *Perry v. Joseph*, 10th Dist. No. 07AP-359, 2008-Ohio-1107, ¶ 13, citing *State v. Wright*, 10th Dist. No. 03AP-470, 2004-Ohio-677, ¶ 11. A reviewing court will not reverse a trial court's decision on a CPO simply because it holds a different opinion concerning the credibility of the witnesses and the evidence

submitted to the trial court. *Crabtree*, 2013-Ohio-5797, ¶ 11, citing *Fleckner v. Fleckner*, 177 Ohio App.3d 706, 2008-Ohio-4000, ¶ 15, (10th Dist.). If the evidence is susceptible of more than one interpretation, a reviewing court must construe the evidence consistently with the trial court's judgment. *Id.*, citing *Fleckner.*

{¶ 29} Having carefully reviewed the entire record, we find that the trial court's judgment is not against the manifest weight of the evidence. The trial court did not err by concluding appellant failed to establish that appellee committed domestic violence, as defined in R.C. 3113.31, by a preponderance of the evidence. Accordingly, we overrule appellant's assignment of error.

{¶ 30} As appellant notes in her brief, the trial court's judgment entry contains a clerical error. Appellant sought a domestic violence CPO pursuant to R.C. 3113.31. The trial court's judgment entry states that "[t]he court finds that the Petitioner has failed to meet the requisite burden to provide that pursuant to *R.C. 311.31,* she required a Civil Protection Order by a preponderance of the evidence." (Emphasis added.) We find this to be a clerical error, and we therefore remand this cause to the trial court for the limited purpose of issuing a nunc pro tunc entry reflecting the correct statutory section.

{¶ 31} Accordingly, having overruled appellant's single assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, and Juvenile Branch, and remand the matter to that court for the limited purpose of entering a nunc pro tunc entry correcting the aforementioned clerical error in the judgment entry.

*Judgment affirmed; case remanded with instructions.*

SADLER, P.J., and NELSON, J., concur.

————————————